UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X

UNITED STATES OF AMERICA        :

    -against-        :        12-CR-160 (NGG/LB)

SHERMAN BARRO,        :

              Defendant.        :
-------------------------------------------------------X

# DEFENDANT'S POST-HEARING BRIEF
# IN SUPPORT OF HIS MOTION TO SUPPRESS STATEMENTS

                                          Kannan Sundaram, Esq.
                                          Federal Defenders of New York
                                          Attorney for Defendant
                                          One Pierrepont Plaza - 16th Floor
                                          Brooklyn, New York 11201
                                          (718) 330-1203

TO:    Loretta Lynch, Esq.
         United States Attorney
         Eastern District of New York
         Attn: AUSA Tiana Demas

Defendant Sherman Barro, by his attorneys, submits this brief in further support of his motion to suppress his post-arrest statements to federal law enforcement agents.

## STATEMENT OF FACTS

On January 31, 2012, Mr. Barro, his wife and their 1½ year-old son arrived at the JFK Airport on a Carribean Airlines flight from Kingston, Jamaica. During secondary inspection, Customs and Border Protection ("CBP") officers probed their luggage and discovered cocaine in two of the bags. Mr. Barro and his wife Omega were placed under arrest and separately questioned by agents of the Immigration and Customs Enforcement unit ("ICE"). Both of them denied knowledge of the drugs discovered inside the bags. Mr. Barro, but not his wife, was charged with importing the drugs into the U.S.

In an affidavit filed in support of this motion to suppress, Mr. Barro acknowledged that, before they interviewed him about the trip and the surrounding events, the agents told him about his rights and that he signed a form and agreed to speak with them. Before reading Mr. Barro his rights, however, the agents made various statements exhorting him to speak to them. They told him that it was a lot of cocaine, that it could get him locked up for 25 years, that he should talk to them and tell them the truth, and that if he did they would tell the prosecutor that he spoke to them and gave them information. If he did not speak to them, on the other hand, his wife would be locked up or arrested, too, and his son could end up in foster care.

Thomas Wilbert, the ICE agent who questioned Mr. Barro, testified at the suppression hearing. As a special agent with ICE's Joint Narcotics Smuggling Unit ("JNSU"), Wilbert's main duties "are investigating narcotics smugglers, mainly responding to seizures at the airport

1

and working that case, trying to determine who the drugs are going to, where the drugs came from" (4).[1]

On January 31, 2012, at about 12:20 in the afternoon, Agent Wilbert and his partner, Agent Pauta, came to the room where Mr. Barro was being held in response to a call from CBP stating that they had seized cocaine from a passenger (7, 9). When Agent Wilbert first encountered him, Mr. Barro and his luggage were in a "pat-down" room in the custody of CBP officers (8-9, 29). Mr. Barro's wife and son were in the room next door with other CBP officers (9).

Both Mr. Barro and his wife were going to be placed under arrest (10). After learning from the CBP officers that Mr. Barro had presented the bags and that he was unemployed and that his wife was employed as a nurse, Agent Wilbert decided to speak to Mr. Barro's wife first. Agent Wilbert made this decision "thinking maybe he might be more involved with what's happening than what she is and she might be more forthcoming with the answers if she's not involved than what he would be" (10, 30)

After advising Ms. Barro that she was under arrest for importation of cocaine, and asking if she was willing to speak to them, Agent Wilbert read Ms. Barro her *Miranda* rights from a card. Ms. Barro waived her rights and agreed to speak, and Agent Wilbert asked her about the trip and her husband, including "general questions about her feelings about her husband" (12). The purpose of the trip, Ms. Barro informed him, was to attend her grandfather's funeral (13). Although she had not planned on going because she did not have the money, her mother convinced her to go and Mr. Barro told her he could get money from his father to pay for the trip

---

[1] Numbers in parentheses refer to pages of the hearing transcript.

(13). But instead of just giving her the money himself, Mr. Barro gave the money to her mother and her mother then paid her (13-14).

And instead of traveling together, Mr. Barro went to Jamaica on Thursday and Ms. Barro got there on Saturday or Sunday (14). Both of the suitcases in the room with Mr. Barro belonged to him, and one of them he had just purchased recently (14).

In response to Agent Wilbert's questions about her husband's financial situation, Ms. Barro said that he had recently made a number of purchases of clothes and glasses that could not be accounted for by his income. When she asked him where he got the money from, he wouldn't answer her (15).

In response to the agent's questions about "her husband and drugs," Ms. Barro said that her husband was "into marijuana" and had told her that he sells weed one time when they were in Jamaica (15). Mr. Barro had also spoken to her about moving to California because selling marijuana is legal there and had talked about a friend who sells cocaine, in a way that made her feel that he was trying to get her approval for selling cocaine (15). In talking about selling cocaine, he had also made reference to his need to make a quick ten thousand dollars (16). Ms. Barro also said that her husband wanted her to take an earlier return flight, and that she suspected that he wanted them to fly together to reduce the chance they would be stopped by the officers (16).

After this questioning of Ms. Barro, Agent Wilbert was satisfied that she was telling him the truth:

> Q   Without going through all of those things again, again the reason you picked her first was you thought that he might be more involved and she might be more forthcoming, right?

3

> A  Yes.
>
> Q  Is it fair to say that you left with the conclusion that she was more forthcoming?
>
> A  I left thinking that she was - - she seemed to me being - - that she was being truthful (31).

After speaking to Ms. Barro for 30 to 40 minutes, Agent Wilbert conferred with Agent Pauta and the CBP officers and then went to speak to Mr. Barro (17). Before advising Mr. Barro of his rights, Agent Wilbert gave him a "spiel" he generally gives arrestees in every case before reading them their rights (18). One of the purposes of this spiel is to let the drug courier know that it might be in his "best interest to cooperate and tell the truth" (33).

In this pre-warning "spiel," Agent Wilbert told Mr. Barro that he was under arrest for the importation of cocaine; that "it's a serious offense, what's happening here," that this was a lot of cocaine that had been seized and that he was facing a lot of time; that "it's important that he is honest with me and that he tells me the truth"; that "his cooperation is something that could help him out in the long run"; that "by telling the truth, I will let the AUSA know and it could help him possibly with a lower sentence. I also tell him that I can't guarantee him anything, I can't promise him anything. I can't determine his sentence, the AUSA can't determine his sentence, that is solely up to the judge, but from what I've seen in the past, people that have told the truth have received lesser sentences. I also tell him that it's up to him if he wants to talk. If he doesn't, that's fine also. We'll be up here and we'll have another seizure in a few more hours after that, so it's up to him what he wants to do" (18-19, 33-34).

After giving Mr. Barro this spiel, Agent Wilbert asked Mr. Barro if he wanted to talk to them, and Mr. Barro responded that he did:

4

> Q      After giving that preliminary spiel, did you then read the defendant his rights?
>
> A      Well, then I had asked him if he wants to talk to us, and if he acknowledges "yes," then I read him his rights (19).

Using his *Miranda* card, Agent Wilbert read Mr. Barro his rights at about 1:30 p.m (17-18, 35). Mr. Barro acknowledged that he understood them. Agent Wilbert asked Mr. Barro if he was willing to waive the rights and talk to him. Mr. Barro said something along the lines of "I'll tell you what's what" (18).

The agents started asking Mr. Barro questions "about the bags, about the cocaine, about his knowledge about the cocaine being in the bags, who the bags were going to, whether he was going to get paid or not" (19). After about eight minutes of questioning in the pat-down room, the agents took Mr. Barro up to their JNSU processing room to continue the interrogation (19-20). At that point Agent Wilbert had determined that Mr. Barro was not going to be truthful with them and so they would not be attempting a controlled delivery (20).

Before taking Mr. Barro to the JNSU room, Agent Wilbert "told him that right now he's not claiming knowledge to the drugs, his wife had [] not claimed knowledge to the drugs, and right now they're both under arrest and we're going to be processing them, we're going to be up to the different floor and that right now, you know, we're going to have to call Child Protective Services for his child" (21). The purpose of mentioning Child Protective Services to Mr. Barro was to let "him know what the situation was. It was that we have narcotics. He's travelling together with his wife. We don't know the full story. You have two people that are arrested and [] it's a definite possibility that his son may be going with Child Protective Services" (23).

Agent Wilbert denied telling Mr. Barro that if he did not speak to them, his wife would be

locked up or arrested too; asking him if he wanted to see his child in a foster home; or verbally attacking him for putting his child through this ordeal (23).

In the JNSU room, Mr. Barro continued answering the agents' questions for over an hour (20, 23). Asked by the prosecutor whether Mr. Barro "was being cooperative, non-cooperative, or something in between," Agent Wilbert responded, "Non-cooperative" (20). By "not cooperative," Agent Wilbert clarified, he meant "not truthful" (32; see 31).

## ARGUMENT

**BECAUSE THE INTERROGATION TECHNIQUE EMPLOYED BY THE AGENTS UNDERMINED THE *MIRANDA* WARNINGS AND INVALIDATED MR. BARRO'S WAIVER OF RIGHTS, HIS STATEMENTS TO THE AGENTS SHOULD BE SUPPRESSED.**

The Self-Incrimination Clause of the Fifth Amendment guarantees that no person "shall be compelled in any criminal case to be a witness against himself," and bars the introduction of involuntary confessions in response to custodial interrogation. *Withrow v. Williams*, 507 U.S. 680, 688 (1993), quoting U.S. Const., Amdt. V.

In *Miranda v. Arizona*, the Supreme Court "concluded that without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." 384 U.S. 436, 467 (1966); *Thompson v. Keohane*, 516 U.S. 99, 107 (1995). "In order to combat these pressures and to permit a full opportunity to exercise the privilege against self-incrimination," the *Miranda* Court held, "the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored." 384 U.S. at 467.

Recognizing that the Constitution does not necessarily require "adherence to any particular solution for the inherent compulsions of the interrogation process" and encouraging Congress and the States to continue searching for effective ways to protect the privilege, the Court pronounced: "However, unless we are shown other procedures which are at least as effective in apprising accused persons of their right of silence and in assuring a continuous opportunity to exercise it, the following safeguards *must be observed*." *Id.* (emphasis added).

(1) "*At the outset, if a person in custody is to be subjected to interrogation, he must first be informed in clear and unequivocal terms that he has the right to remain silent.*" *Id* (emphasis added).

.     (2) "The warning of the right to remain silent must be accompanied by the explanation that anything said can and will be used against the individual in court.*" *Id.* at 469.

(3) As "the right to have counsel present at the interrogation is indispensable to the Protection of the Fifth Amendment privilege[,]" an individual held for interrogation must be clearly informed that he has the right to consult with a lawyer and to have the lawyer with him during interrogation under the system for protecting the privilege we delineate today." *Id.* at 469, 471.

(4) The individual must be told that if he cannot afford an attorney one will be appointed to him prior to any questioning. *Id.* at 473, 479.

"The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently." *Miranda*, 384 U.S. at 444. "If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his

7

privilege against self-incrimination and his right to retained or appointed counsel." *Id.* at 475; *See United States v. Capers*, 627 F.3d 470, 479 (2d Cir. 2010). To be voluntary, the accused's decision to relinquish his Fifth Amendment rights and speak without counsel must be "the product of a free and deliberate choice rather than intimidation, coercion, or deception," *Moran v. Burbine*, 475 U.S. 412, 421 (1986), and "any evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege." *Miranda*, 384 U.S. at 476.

Here, Agent Wilbert, by his own account, impressed upon Mr. Barro that he was facing a substantial prison sentence, emphasized that he would receive better treatment from the government and the court if he cooperated with the agents and told them the truth, and then asked Mr. Barro if he was willing to answer their questions – all *before* advising Mr. Barro, who had by then been in custody and under arrest for an hour and a half, of his *Miranda* rights and the potential adverse consequences of waiving them.[2] Contrary to the government's position, this does not comply with *Miranda*.

"At the outset, if [Mr. Barro was] to be subjected to interrogation, he [should] first [have been] informed, in clear and unequivocal terms that he has the right to remain silent." *Id.* at 467. Instead, what Agent Wilbert informed Mr. Barro at the outset was that he should *speak* to him,

---

[2]A defendant is in custody for *Miranda* purposes if he has been subjected to "a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest," *California v. Beheler*, 463 U.S. 1121, 125 (1983), so that a reasonable person in his position would feel "not at liberty to terminate the interrogation and leave." *Tankleff v. Senkowski*, 135 F.3d 235, 243 (2d Cir. 1998). Here, as Agent Wilbert testified and the government conceded at oral argument, Mr. Barrow was under arrest as soon as the CBP officers took him into the pat-down room (48-49). *See United States v. Ali*, 68 F.3d1468 (2d Cir. 1996).

8

and be "honest with" him and "tell[] him "the truth." Thus, instead of safeguarding Mr. Barro's Fifth Amendment right, Agent Wilbert tried to persuade him to relinquish it. It is manifestly improper, and antithetical to *Miranda*, for law enforcement officials to persuade a defendant in custody to waive his constitutional rights: "If the individual desires to exercise his privilege, he has the right to do so. This is not for the authorities to decide." 384 U.S. at 480.

Beyond blatantly contravening *Miranda*'s clear and simple instructions, the agent's manipulative pre-warning lead-in is at odds with the salutary purpose of the rule. While a prompt advisement of the defendant's right to remain silent is meant to combat the inherent pressures of the interrogation atmosphere, replacing this advisement with an immediate exhortation to speak and tell the truth could only exacerbate those pressures. Compounding this coercive effect were Agent Wilbert's related comments emphasizing the large amount of cocaine seized from Mr. Barro's luggage and the long sentence he was facing.

The required but omitted immediate warning to Mr. Barro of his right to remain silent should have been "accompanied by the explanation that anything said can and will be used against" him in court. *Miranda*, 384 U.S. at 469. Instead, Agent Wilbert's improper exhortation to speak was accompanied by the explanation that the things he says (if accepted as "the truth") would likely *help* him in court, by influencing the prosecutor and the judge to give him a lesser sentence. That advice by the agent thus squarely contradicted the required advisement at this juncture about the *adverse* "consequences of foregoing" the Fifth Amendment privilege, and eradicated that warning's crucial function "to make the individual more acutely aware that he is faced with a phase of the adversary system – that he is not in the presence of persons acting solely in his interest." *See id.*

9

While that conflict is reason enough that law enforcement authorities should refrain from giving unwarned suspects legal advice, the advice given here was also unbalanced and misleading.  Unbalanced because though telling "the truth" in post-arrest questioning may sometimes inure to a defendant's benefit, it also creates evidence that will invariably be used against him.  Misleading because Agent Wilbert's claim that telling "the truth" at this stage usually leads to lower sentences seems doubtful, at best.  Certainly, neither the government nor the sentencing court would treat a defendant differently based on whether he asserts his Fifth Amendment privilege.  And in this case, Mr. Barro, despite the government's view that he did *not* tell the truth in his post-arrest statement, received the standard "bump-down" plea offer all the same.

And if Agent Wilbert was referring to cooperation with the government, it is false and/or misleading to suggest that this option is available only to suspects who are willing to speak immediately or without counsel.  *United States v. Anderson*, 929 F.2d 96, 100 (2d Cir. 1991).  As the Second Circuit has observed, it is "commonplace" for defendants to cooperate with the government afterwards with the assistance of counsel and receive the same consideration under the Guidelines.  *Id.*

Not only impeding Mr. Barro's ability to make an unfettered decision about exercising his rights, Agent Wilbert's statements exhorting him to cooperate and "tell the truth" amounted to "interrogation" under *Miranda*.  "Interrogation" includes express questioning but also its "functional equivalent," meaning "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980); *United States*

*v. Plugh*, 576 F.3d 135, 143-44 (2d Cir. 2009).

Most clearly, the agent's statement that Mr. Barro should be honest with him and tell him the truth was interrogation. Indeed, those statements were essentially an outright request that Mr. Barro incriminate himself. But the agent's statements to Mr. Barro adverting to the large quantity of cocaine he possessed, the sentencing exposure he faced, and the resulting need to cooperate with them, were also the functional equivalent of interrogation. *See Innis*, 446 U.S. at 301; *United States v. Szymaniak, 934 F.2d 434, 439 (2d Cir. 1991)* (confronting defendant with incriminating information was functional equivalent of interrogation). Indeed, Agent Wilbert's statement that Mr. Barro's cooperation could help him and would be brought to the attention of the AUSA has been specifically held to constitute interrogation. *United States v. Pugh*, 576 F.3d at 144 (statement that any cooperation would be brought to the attention of the AUSA); *United States v. Montana*, 958 F.2d 516, 518 (2d Cir. 1992) (same); *United States v. Johnson*, 812 F.2d 1329, 1331 (11th Cir. 1986) (statement suggesting that cooperation would be beneficial).

Since the required warnings must precede the *interrogation*, and not just the statement, this pre-warning interrogation violated *Miranda*. *See* 384 U.S. at 444, 445, 457, 467, 477, 479. As Agent Wilbert's unwarned interrogation of Mr. Barro immediately produced, in short order, an oral agreement to speak, a written waiver of rights, and a statement, all of those were "elicited in noncompliance with" the rule, *Stansbury v. California*, 511 U.S. 318, 322 (1994), and should therefore be suppressed.

Par for the course, when Agent Wilbert did get to the task of actually advising Mr. Barro of his rights, he should have done that *before, not after*, asking him if was willing to answer questions. *See id.* at 467-68; *Oregon v. Elstad*, 470 U.S. 298, 308 (1985) ("Once warned, the

11

suspect is free to exercise his own volition in deciding whether or not to make a statement to the authorities"). Asking a person in custody if he is willing to speak and thereby give up his rights *before* informing him about them, puts the cart before the horse, and defeats *Miranda*'s central purpose of safeguarding the in-custody person's ability to make that very decision with the requisite knowledge of his rights. *See Miranda*, 384 U.S. at 467 ("For those unaware of the privilege, the warning is needed simply to make them aware of it – the threshold requirement for an intelligent decision as to its exercise. More important, such a warning is an absolute prerequisite in overcoming the inherent pressures of the interrogation atmosphere").

"Just as no talismanic incantation [is] required to satisfy [*Miranda's*] strictures, it would be absurd to think that mere recitation of the litany suffices to satisfy *Miranda* in every conceivable circumstance." *Missouri v. Seibert*, 542 U.S. 600, 611 (2004). In this case, as set forth above, Agent Wilbert's pre-warning "spiel" conveyed to Mr. Barro, and convinced him, that it was in his best interest to speak to the authorities before he had even been advised of his rights or the adverse consequences of waiving them. Moreover, like the recently condemned preamble employed by the Queens District Attorney's office, it "adds information and suggestion to the Miranda warnings which prevent them from effectively conveying to suspects their rights." *People v. Dunbar*, _ N.Y.S.2d _, 2013 WL 361822, *8 (N.Y.A.D. 2 Dept.) (advising suspects of their Fifth Amendment privilege against self-incrimination, but only after being told that this is their opportunity to, essentially, refute what prosecutor has been told by others, to correct any misperceptions or falsehoods, and to try to help themselves). "When the clear and unequivocal warnings devised in Miranda are combined with the information and suggestion contained in" Agent Wilbert's preamble, "the message conveyed" is, at best, "muddled and ambiguous." *Id.*

12

Under these circumstances, the recitation of the litany at this juncture, after the significance of the rights had been diminished and the force of the warnings diluted, was not "effective to secure the privilege against self-incrimination" as *Miranda* requires.  384 U.S. at 444, 467.

Because the procedure employed by the agents in this case failed to comply with *Miranda* by a long shot, the statements obtained from Mr. Barro should be suppressed under *Miranda*'s prophylactic rule.

Although not required to support this result, suppression is mandated here for the additional reason that the interrogation technique employed was used "in a calculated way to undermine the *Miranda* warning" and was "designed to circumvent" *Miranda* and "obscure[] its meaning."  *Seibert v. Missouri*, 542 U.S. 600, 618 (Kennedy, J., concurring).  This purpose is readily apparent from the contents of the spiel, which systematically impairs the message conveyed by the warnings while evincing no apparent purpose other than to induce defendants to cooperate.  *Cf. Seibert*, 542 U.S. at 620-21 (Kennedy, J., concurring) ("question-first" tactic "relies on an intentional misrepresentation of the protection that *Miranda* offers and does not serve any legitimate objectives that might otherwise justify its use").  In any event, Agent Wilbert made no pretense about this, agreeing that a purpose of the spiel is to let the defendant know that it might be in his "best interest to cooperate and tell the truth" (33).

Like the "question-first" tactic condemned in *Seibert*, this "persuade-first" technique "distorts the meaning of *Miranda* and furthers no legitimate countervailing interest.  The *Miranda* rule would be frustrated were we to allow police to undermine its meaning and effect."  *Id.* at 621.

Relatedly, and as previously set forth in defendant's pre-hearing reply memorandum, the

13

agents' improper pre-warning advice to Mr. Barro invalidated his waiver. Even if the Court were to find that Agent Wilbert's remarks about what might happen to Mr. Barro's family were made only after *Miranda* warnings had been given,[3] the agent's unwarned and successful exhortation that Mr. Barro speak to them – supplemented by his unbalanced and misleading advice that it would improve his situation – impermissibly undermined the subsequent warnings and interfered with Mr. Barro's ability to make an informed and unfettered decision as to whether or not he should waive his constitutional rights. *See* Defendant's Reply Memorandum, Doc. 24 at pp. 2, 5.

In this regard, Agent Wilbert's hearing testimony confirmed and even bolstered Mr. Barro's sworn allegations that the agents cajoled him into waiving his rights, in express contravention of *Miranda*. *See* 384 U.S. at 476. This evidence, which has not been disproven, thus "show[s] that [Mr. Barro] did not voluntarily waive his privilege." *Id;* See Defendant's Reply Mem., Doc. 24 at p. 2. As the government failed to meet its heavy burden of

---

[3] Even if made after the *Miranda* warnings had been issued, Agent Wilbert's statements to Mr. Barro about his wife and child were improper, coercive and false, and call for suppression of his ensuing statements on the ground that they were coerced. *See Lynum v. Illinois*, 372 U.S. 528, 534 (1963). Essentially, Agent Wilbert testified that he told Mr. Barro, before taking him to the JNSU room, that because neither one of them was admitting knowledge of the drugs, they were going to process and charge both of them, and thus have to call Child Protective Services to pick up their son. This statement to Mr. Barro was false. As Agent Wilbert testified, he had already concluded from his earlier interview with Mr. Barro's wife – which itself centered mostly on Mr. Barro's culpability – that she, unlike him, was being truthful. Consistent with that, only Mr. Barro was processed and charged, and his wife was not charged despite neither one of them admitting knowledge of the drugs. This affirmative misrepresentation, especially taken together with the litany of pre-warning statements pressuring Mr. Barro to speak, rendered his statements involuntary. *See Lynum*, 372 U.S. at 533-34 (misrepresentation by police officers that suspect would be deprived of state financial aid for her dependent child is she failed to cooperate rendered subsquent confession involuntary); *United States v. Tingle*, 658 F.2d 1332, 1336-37 (9th Cir. 1981).

14

demonstrating that the waiver of rights was knowing, voluntary and intelligent, on this basis, as well, the ensuing statements should be suppressed.

## CONCLUSION

For the reasons advanced here, at the post-hearing oral argument and in defendant's previously filed motion and memorandaforegoing reasons, Mr. Barro's statements should be suppressed.

Brooklyn, New York
February 26, 2013

                                       Respectfully Submitted

                                       David Patton
                                       Federal Defenders of New York
                                       Attorney for the Defendant

                              By:_____
                                 Kannan Sundaram
                                 One Pierrepont Plaza
                                 16th Floor
                                 Brooklyn, N.Y. 11201
                                 (718) 330-1203

TO:    AUSA Tiana Demas
          Clerk of Court (by ECF)