

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

SLT:TAD  
F.#2012R00190

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

March 5, 2013

**By ECF and Interoffice Mail**

The Honorable Lois Bloom
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

   Re: United States v. Sherman Barro
     <u>Criminal Docket No. 12-160 (NGG)</u>

Dear Magistrate Judge Bloom:

  The government respectfully submits this letter in response to the Defendant's Post-Hearing Brief in Support of Motion to Suppress Statements, dated February 26, 2013 ("Def. Br."). For the reasons explained below and in the government's prior papers and oral argument, the defendant's motion should be denied, as there is no legal basis to support the suppression of his statements.

I. <u>Background</u>

  The defendant Sherman Barro ("Barro" or "defendant"), is charged in a two-count indictment with importation and possession of 500 grams or more of cocaine, in violation of 21 U.S.C. §§ 952(a), 960(a)(1), 960(b)(2)(B)(ii), 841(a)(1) and 841(b)(1)(B)(ii)(II). The charges stem from the defendant's January 31, 2012 trip from Jamaica to New York, during which he smuggled approximately 4,826.5 grams of cocaine into the United States in his luggage. The defendant was traveling with his wife and his infant son. His wife was initially arrested and questioned but was determined to be uninvolved in the offense and was not charged with any crime.

  On December 4, 2012, the defendant moved to suppress his post-arrest statements to agents on the grounds that in eliciting his statements, agents "improperly threatened [] and cajoled him into speaking to them before advising him of his

rights." See Docket No. 19, p. 2.  Specifically, Barro claimed that agents told him: (1) there was a lot of cocaine in his suitcases and it could get him locked up for 25 years; (2) if he spoke to agents, they could tell the prosecutor about his cooperation; (3) if the defendant did not speak to the agents, they would "lock up or arrest" Barro's wife; and (4) the agents "asked if I wanted to see my child in foster care, and attacked me (verbally) for putting my child through this."  See Docket No. 19, p. 8, ¶ 7.

On February 13, 2013, the Court held a suppression hearing.  The government presented the testimony of Special Agent Thomas Wilbert of the Department of Homeland Security.  The defendant did not call any witnesses, and he did not testify at the suppression hearing.

Special Agent Wilbert testified that he had received training on how to Mirandize suspects at the Federal Law Enforcement Training Center ("FLETC"), during a six-month training course.  He stated he had been taught:

> [A]ny time there's an arrest . . . the person has to be Mirandized.  They have to be given their warnings.  They have to know what their warnings are.  They have to understand them.  They have to be given without threat, force, or any type of coercion.

February 13, 2013 Transcript of Suppression Hearing ("Tr.") at 5:17-22.

Special Agent Wilbert testified that when he reads suspects their rights, he first asks if the suspect "is willing to speak to us."  Tr. 12:5-6.  If the suspect says yes, Special Agent Wilbert reads "each line" of a Miranda card that contains the required warnings.  Tr. 11-12.  After each line, Special Agent Wilbert has the suspect "acknowledge either by nodding their head or by verbally acknowledging to [him] that they understand each line."  Tr. 12:6-8.  The agent testified that he then reads the suspect the waiver section of the Miranda card, at which point he asks the suspect if he understands his rights, and again waits to receive either a nod or a verbal answer.  Tr. 12:10-11.  Special Agent Wilbert then asks the suspect if he is willing to waive his rights and speak to the agent.  Id. at 12:12-15.  If the suspect agrees, the agent begins questioning the suspect about the subject offense.

3

Special Agent Wilbert testified that as a general rule, he does not launch straight into reading a suspect his rights. Rather, he first gives a preliminary "spiel" explaining who he is and what is going on. Tr. 18. Agent Wilbert testified that he gave this preliminary spiel to the defendant, which he described as follows:

> I told him that he was under arrest for the importation of cocaine. I identified myself as a federal agent. I tell him that it's a serious offense, what's happening here. I tell him that it's important that he is honest with me and that he tells me the truth. I tell him that, you know, his cooperation is something that could help him in the long run. I tell him that by telling me the truth, I will let the AUSA know and it could help him possibly with a lower sentence. I also tell him that I can't guarantee him anything, I can't promise him anything. I can't determine his sentence, the AUSA can't determine his sentence, that is solely up to the judge, but from what I've seen in the past, people that have told the truth have received lesser sentences. I also tell him that it's up to him if he wants to talk. If he doesn't, that's fine also. We'll be here and we'll have another seizure in a few more hours after that, so it's up to him what he wants to do.

Tr. 18:14-19:6.

After making this introduction to the defendant, Special Agent Wilbert asked Barro if he wanted to talk to the agents. The defendant said he did. Special Agent Wilbert then read the defendant his Miranda rights, which the defendant verbally waived. The agent then began questioning the defendant. Tr. 18-19.

The agent soon determined that the defendant was not being truthful. Tr. 20:13-19; 32:7-15. At that point in time, both the defendant and his wife were under arrest. Neither had taken responsibility for the drugs in the defendant's suitcase. They were traveling with their small child, who was approximately one year old. Tr. 21:1-12. Special Agent Wilbert told the defendant that they "were going to have to call Child Protective Services for his child." Id. The agent testified that he did not mention Child Protective Services to threaten the defendant. He stated:

4

> It was more or less letting him know what the situation was. It was that we have narcotics. He's traveling together with his wife. We don't know the full story. You have two people that are arrested and . . . it's a definite possibility that his son may be going with Child Protective Services.

Tr. 22:23-23:3. The reference to Child Protective Services was made after the defendant had been Mirandized. Id. at 23:4-6. The agent denied ever threatening to place the defendant's child in foster care or berating the defendant for "putting his child through this." Tr. 23:7-15. Special Agent Wilbert questioned the defendant for approximately 90 minutes. Tr. 23:23-25. Throughout the interview, the defendant appeared to be mentally stable and sober. Tr. 20:20-25. The defendant did not break down in tears at any point during the interview. Tr. 24:1-3.

II. Argument

A waiver of Miranda rights is voluntary when: (1) "the defendant had a full awareness of the right being waived and of the consequences of waiving that right"; and (2) "the relinquishment of the defendant's rights was voluntary." United States v. Jaswal, 47 F.3d 539, 542 (2d Cir. 1995).

Barro does not claim that he failed to understand the rights being waived or the consequences of waiving those rights. Instead, he claims that Special Agent Wilbert's preliminary introduction somehow rendered his waiver involuntary. Alternatively, the defendant argues that Special Agent Wilbert threatened to arrest the defendant's wife and put the defendant's child in foster care if the defendant did not make a statement, and that this threat overbore the defendant's will and made his statement involuntary. Special Agent Wilbert denied making these threats. He credibly explained that the only reason he mentioned Child Protective Services was because: (1) the defendant was traveling with his wife and infant son; (2) at that point, both the defendant and his wife were under arrest; (3) no one was claiming responsibility for the drugs; (4) if both the defendant and his wife stayed in custody, Child Protective Services would have to be notified. There is thus no merit to either of the defendant's arguments.

>    A.   The Agent's Preliminary Introduction Did Not
>         <u>Render Barro's Miranda Waiver Involuntary</u>

The "preliminary spiel" that Special Agent Wilbert made conveyed the following information, all of which has been deemed appropriate by the Second Circuit:

- The defendant was being arrested for importing cocaine;
- This crime was a "serious offense";
- It was important for the defendant to be honest;
- Cooperation could help the defendant in the long run;
- If the defendant told the truth, the agent would convey that information to the AUSA, which could possibly help the defendant with a lower sentence;
- Neither the AUSA nor the agent would decide the defendant's sentence; the judge decides the sentence;
- The agent cannot promise anything;
- It was up to Barro if he wanted to talk;
- If Barro did not want to talk, that was fine.

<u>See</u> Tr. 18:14-19:6.

Informing the defendant of the particular crime for which he had been arrested is entirely appropriate, and the defendant does not appear to claim otherwise. Characterizing the defendant's particular crime as a "serious offense" also is appropriate. Assuming that the phrase "serious offense" somehow conveys the amount of prison time that the defendant might serve were he to be convicted, the Second Circuit has held that informing a defendant of his potential sentence does render his statement "involuntary." <u>See</u> <u>United States v. Alvarado</u>, 882 F.2d 645, 649 (2d Cir. 1989), <u>overruled on other grounds by</u> <u>Bailey v. United States</u>, 516 U.S. 137 (1995) (defendant's statements not involuntary where agent told the defendant that "if she does not cooperate she is going to get ten years, just like Scoobie."). In the same vein, it is not coercive to tell a defendant that if he cooperates, the prosecutor will be informed. <u>See, e.g.</u>, <u>United States v. Gaines</u>, 295 F.3d 293, 299 (2d Cir. 2002); <u>United States v. Ruggles</u>, 70 F.3d 262, 265 (2d Cir. 1995). Similarly, Agent Wilbert's statement that cooperating could help him in the long run is not coercive, and the Second Circuit has so held. <u>Ruggles</u>, 70 F.3d at 265 ("Certainly, statements to the effect that it would be to a suspect's benefit to cooperate are not

6

improperly coercive."). In sum, nothing about Special Agent Wilbert's "preliminary spiel" was inherently coercive.

The defendant appears to argue that even if no individual part of the agent's preliminary introduction was improper, somehow the introduction as a whole was coercive. In support of this dubious notion, the defendant relies principally on a recent Appellate Division case that is not binding on this Court, and, in any event, is inapplicable to the facts of the defendant's interrogation.

In People v. Dunbar, 958 N.Y.S.2d 764 (N.Y. App. Div. 2013) (slip opinion), the Second Department of the New York Supreme Court, Appellate Division, held that a program instituted by the Queen's County District Attorney ("Queens DA's Office") violated suspects' Miranda rights. Under this program, just prior to being arraigned, the Queens DA's Office would read a script to defendants immediately before reading them their Miranda rights. The preamble, Miranda warnings and any resulting statement were videotaped. The "preamble" went as follows:

> If you have an alibi, give me as much information as you can, including the names of any people you were with.
>
> If your version of what happened is different from what we've been told, this is your opportunity to tell us your story. If there is something you need us to investigate about this case you have to tell us now so we can look into it.
>
> Even if you have already spoken to someone else you do not have to talk to us.
>
> This will be your only opportunity to speak with us before you go to court on these charges.

Dunbar, 958 N.Y.S.2d at *2.

The Second Department Appellate Division held that this preamble violated a defendant's privilege against self-incrimination because: (1) while suspects were advised of their Miranda rights, they were only read their rights "after being told that this is their 'opportunity' and their 'only opportunity' to, essentially, refute what the prosecutor has been told . . . to correct any misperceptions or falsehoods, and to try to help themselves"; (2) this "opportunity" is with an ADA, "the one person who can [at the pre-arraignment] stage, plausibly

assert authority to grant favorable treatment to an uncounseled defendant"; (3) the preamble "suggests a sense of immediacy and finality which impairs suspects' reflective consideration of their rights and the consequences of a waiver." Id. at *6. The Appellate Division noted: "although suspects . . . are told, through the Miranda warnings, that they have the right to remain silent, the preamble suggests that invoking that right will bear adverse, and irrevocable consequences." Id.

As a threshold matter, Dunbar is not binding on this Court. Even assuming that it were persuasive authority, the preamble given by the Queens DA's Office is distinguishable from Special Agent Wilbert's preliminary introduction. Special Agent Wilbert did not tell the defendant that this was his "only opportunity" to refute what the prosecutor had been told. Indeed, no prosecutor was present for the interrogation and none had even been contacted yet. The agent specifically told the defendant that neither he nor the AUSA would decide Barro's sentence – that was up to the judge. The defendant was not rushed in any way, nor was he told that this was his one chance to talk. To the contrary, Agent Wilbert told Barro: "it's up to him if he wants to talk. If he doesn't, that's fine also. We'll be here and we'll have another seizure in a few more hours after that, so it's up to him what he wants to do." Tr. 19. Far from impressing "a sense of immediacy and finality," the agent's introduction conveyed a laissez-faire view as to whether or not the defendant made a statement. Thus, even under the analysis in Dunbar, Special Agent Wilbert's preliminary spiel did not render the defendant's Miranda waiver involuntary.[1]

---

[1] The other cases defendant cites (see Def. Br. 11-13) are inapposite because they all address situations where suspects made incriminating statements either before they had been Mirandized or after they had been Mirandized but had invoked the right to counsel. See, e.g., Rhode Island v. Innis, 446 U.S. 291, 301 (1980), United States v. Johnson, 812 F.2d 1329 (11th Cir. 1986). Here, the defendant did not make any statement until after he had been Mirandized, and he made no statement after he asked for an attorney.

The defendant cites Oregon v. Elstad, 470 U.S. 298 (1985), in support of the argument that he should have been Mirandized before being asked if he was willing to answer questions. Def. Br. 11-12. In Elstad, the defendant made an incriminating statement *before* he had been Mirandized. Id. at 301. He was thereafter read his rights, which he waived before making a full written confession. Id. at 302. The defendant moved to suppress

For the reasons stated above, Special Agent Wilbert's preliminary introduction did not violate the defendant's right against self-incrimination, and his statements should not be suppressed.

>   B.  The Mention of Child Protective Services Did Not Render the Defendant's Miranda Waiver Involuntary

The defendant traveled from Jamaica to the United States with his wife, infant son, and two suitcases containing cocaine. As Agent Wilbert testified, both Barro and his wife initially were under arrest. Under the circumstances, there was nothing coercive or threatening about informing the defendant that if he and his wife were incarcerated, the agent would have to call Child Protective Services for his infant son. See United States v. Garcia, 09-CR-330 (DLI), 2011 WL 6010296, at *5 (E.D.N.Y. Nov. 30, 2011) ("The mere fact that [agent] told the defendant, if both he and his wife were incarcerated, then his children would have to be turned over to a responsible adult or ACS, does not constitute coercion."). The mere mention of Child Protective Services does not render an interrogation coercive,

---

the written confession on the ground that it was tainted by the police's initial failure to read him his rights. The Supreme Court held that the intervening Miranda warning "cured the condition that rendered the unwarned statement inadmissible," and rendered the defendant's post-Miranda confession voluntary. Id. at 310-11. Thus, even if the Court were to accept the argument that the agent's preliminary introduction somehow violated Miranda, that condition was cured when the agent immediately Mirandized Barro and Barro waived his rights.

9

particularly where there is a valid reason for mentioning such a possibility.

III. <u>Conclusion</u>

    For the foregoing reasons, the Court should deny the defendant's motion to suppress.

                        Respectfully submitted,

                        LORETTA E. LYNCH
                        United States Attorney
                        Eastern District of New York

             By:    /s/
                   Tiana A. Demas
                   Assistant U.S. Attorney
                   (718) 254-6116

cc: Kannan Sundaram, Esq. (By ECF)